IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **MITOCHON PRACTICE MANAGEMENT SYSTEMS, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**HEALTHCARE TECHNOLOGY ALLIANCE, LLC,** *et al.***,**<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:13CV177DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on three motions for summary judgment filed by Defendants Healthcare Technology Alliance, LLC, ("HTA"), Akamai Practice Management LLC ("Akamai"), Medtrak Data Systems, Inc. ("Medtrak"), Valli Information Systems, Inc. ("Valli"), Robert Putnam, Mark Service, and Robert Jenkins (collectively "HTA Defendants"): (1) the HTA Defendants' Motion for Summary Judgment Regarding Nielsen Partnership's Good Standing; (2) the HTA Defendants' Motion for Summary Judgment Re: Nielsen Parties' Tortious Interference Claims; and (3) the HTA Defendants' Motion for Summary Judgment Regarding Nielsen Parties's Claims Against Individual Defendants Putnam, Service, and Jenkins.

Since filing the initial motions, the HTA Defendants settled with Plaintiff Mitochon Practice Management Systems, LLC. Therefore, the HTA Defendants' motions are only with respect to the Nielsen Parties' cross-claims against the HTA Defendants. In addition, the Nielsen Defendants did not oppose the motion for summary judgment against the individual defendants.

Therefore, only two motions are at issue.

On March 4, 2015, the court held a hearing on the motions. At the hearing, the HTA Defendants were represented by Ryan B. Hancey, and the Nielsen Defendants were represented by P. Bryan Fishburn. Having fully considered the memoranda submitted by the parties and the facts and law relevant to these motions, the court enters the following Memorandum Decision and Order.

## BACKGROUND

HTA is the owner of certain intellectual property software that is the subject of this litigation. HTA was organized as a Utah limited liability company with four members–Akamai, Medtrak, Valli, and the R.J. Nielsen Family Partnership, LLC ("Nielsen Partnership").

In May 2012, Mitochon contacted HTA to purchase a license to HTA's medical practice management software. Nielsen was HTA's point of contact with Mitochon. Mitochon and HTA discussed the sale of the software through the middle of June 2012, but the parties could not reach an agreement.

At the end of June 2012, Mitochon approached Nielsen directly about his interest in reaching an agreement. Nielsen and Mitochon exchanged counteroffers. In early July 2012, Nielsen contacted the other principals of HTA to discuss Mitochon's offer to deal independently with Nielsen. The principals of HTA's members had three teleconferences. At the conclusion of the last teleconference, Nielsen, Putnam, and Service agreed that it would be in HTA's best interest if Nielsen declined to negotiate directly with Mitochon.

However, Nielsen continued to deal directly with Mitochon. Several offers went back and forth. On August 16, 2012, Mitochon offered an amount agreeable to Nielsen. Nielsen did

not communicate the terms of the offer to HTA. On August 29, 2012, Nielsen entered into a formal, written Memorandum of Understanding with Mitochon.

On October 1, 2012, Nielsen met with the other members of HTA. Nielsen did not tell the members that he had reached an agreement with Mitochon. He did, however, discuss withdrawing from HTA. Under the HTA Operating Agreement, Nielsen could withdraw and obtain a copy of the software if he withdrew in good standing and he had no outstanding debt to HTA. The HTA Operating Agreement states:

> No withdrawing Member shall have any rights to any assets of the Company other than a withdrawing Member shall be entitled to receive complete, non-exclusive rights to all software intellectual property that has been developed by the Company as of the date of withdrawal including the current version of the source code, documentation and ancillary intellectual property that may be required for its use. Said entitlement is contingent upon the withdrawing member having been a member in good standing of the Company for no less than six consecutive months immediately preceding the date of withdrawal and settlement in full by the withdrawing member of any outstanding indebtedness to the Company including any Assessment Advances. Said settlement shall occur within one hundred and twenty (120) calendar days from the date of withdrawal, or Member shall forfeit said Member's entitlement as described above and the Company shall forgive in full any outstanding Assessment Advances.

The parties dispute when Nielsen actually withdrew. Nielsen believes that he withdrew the Nielsen Partnership from HTA in an email he sent on October 3, 2012. HTA does not believe that Nielsen withdrew until a formal withdrawal was done in December 2012.

In any event, Nielsen entered into a formal agreement with Mitochon to sell the software on October 9, 2012. HTA, however, did not give Nielsen a copy of the software upon withdrawal because the members decided that the Nielsen Partnership had not been in good

standing for the six months prior to its request to withdraw and it owed HTA approximately $110,000.

The Nielsen Partnership owed HTA approximately $110,000 because Nielsen did not make an initial payment when the parties started HTA. Nielsen's initial buy-in was considered a note that the Nielsen Partnership owed to HTA. Nielsen disputes that this could be a basis for finding that the Nielsen Partnership was not in good standing because the Operating Agreement allowed it 120 days after withdrawal to come current on any debt owed. Nielsen was able to pay the $110,000 within 120 days of withdrawal because he structured the agreement with Mitochon so that he would receive a payment from Mitochon before the 120 days expired. When Nielsen attempted to make the payment, however, the other HTA members told him that even if he made the payment, they would not turn over the software because the Nielsen Partnership was not in good standing.

HTA's members determined that the Nielsen Partnership was not in good standing because of Nielsen's dealings with Mitochon prior to his withdrawal. The HTA members learned that Nielsen had continued to deal directly with Mitochon while telling the other members that he was not. HTA also believes that Nielsen entered into a formal agreement to sell Mitochon the software prior to the Nielsen Partnership's actual withdrawal from HTA.

## DISCUSSION

The HTA Defendants seek summary judgment on two grounds. First, the HTA Defendants contend that they are entitled to summary judgment on all of the Nielsen Defendants's claims because the claims are premised on the impropriety of HTA's "good standing" determination and HTA's determination is entitled to deference under the business

judgment rule. Second, the HTA Defendants assert that they are entitled to summary judgment on the Nielsen Defendants's intentional interference with economic relations claim because the Nielsen Defendants cannot demonstrate that the HTA Defendants acted with improper means for an improper purpose. The Nielsen Defendants concede that they cannot prove the improper purpose element. Therefore, the only element at issue on the second motion for summary judgment is whether there is evidence that the HTA Defendants acted with improper means.

**1. Good Standing Decision**

The Nielsen Defendants assert various claims against the HTA Defendants which stem from HTA's failure to provide the software upon the Nielsen Partnership's withdrawal from HTA. The HTA Defendants argue that the good standing determination that they made was within the HTA members's business judgment discretion and cannot be the basis for the Nielsen Defendants's claims.

Utah law recognizes that, "in the absence of usurpation, of fraud, or of gross negligence, courts . . . will not interfere at the suit of a dissatisfied minority merely to overrule and control the discretion of the directors on questions of corporate management, policy, or business." *Skeen v. Warren Irr. Co.*, 132 P. 1162, 1164 (Utah 1913). Company directors are presumed to have "acted in good faith and in accordance with sound business principles." *Resolution Trust Corp. v. Hess*, 820 F. Supp. 1359, 1366-67 (D. Utah 1993). Members of a limited liability company have broad power to "decide any matter connected with the business of the company" by "the affirmative vote, approval, or consent of members holding a majority of profits interest in the company." Utah Code Ann. § 48-2c-803. More specifically, the Utah Supreme Court has recognized that "the LLC Act grants substantial latitude to the members of an LLC to determine

the methods of removing a manager through the operating agreement." *Duke v. Graham*, 2007 UT 31, ¶ 19.

Under the HTA Operating Agreement, a member's withdrawal is not automatic. On December 3, 2012, after HTA accepted the Nielsen Partnership's withdrawal, the remaining HTA members met and made the good standing determination. Those HTA members determined that Nielsen had engaged in improper conduct at HTA's jeopardy. HTA contends that when Nielsen was acting as HTA's point person in the Mitochon negotiations, he did not provide all the information necessary to the other HTA members. In addition, in July 2012, Nielsen began dealing independently with Mitochon even though the other members had decided that he should not do so. In fact, Nielsen agreed with the other HTA members to cease discussions with Mitochon but then continued to conduct such discussions. Nielsen did not notify the other members as to his actions. From July 10 to September 19, 2012, Nielsen did not forward any of the Mitochon documents to the HTA members.

The Nielsen Defendants contend that HTA never advised the Nielsen Partnership that it was not in good standing during the six months prior to its request to withdraw. HTA did not make that determination until after it accepted the Nielsen Partnership's withdrawal. However, the Operating Agreement does not state that a determination of good standing has to be made prior to a party's withdrawal. Therefore, this argument does not demonstrate that the HTA Defendants acted outside the parameters of the Operating Agreement.

The Nielsen Defendants also assert that because the Operating Agreement allows its members to compete against one another and against the company in which they are members, the Nielsen Partnership could not have lost its good standing based on competition. The

Operating Agreement gives to the members nonexclusive rights to all software that has been developed upon the member's withdrawal.  There is no provision in the 2007 Operating Agreement specifically precluding the Nielsen Partnership from entering into an agreement with a third party to sell, lease, or license a nonexclusive right to the software in anticipation of its withdrawal from HTA.   However, a withdrawing party's rights upon withdrawal are contingent on being in good standing. The term good standing is not defined in the Operating Agreement.  Therefore, the determination of good standing must be made as a business judgment.  Nielsen agreed that none of the principals of the other HTA members ever acted outside their respective corporate authorities.  Therefore, the good standing decision was within their authority and cannot be a basis for the Nielsen Defendants's claims.

      The Nielsen Defendants further allege that the Nielsen Partnership could have paid the debt owing to HTA within the time allowed under the Operating Agreement because it was to receive a payment for that amount from Mitochon before the 120 days expired.  However, the Nielsen Partnership needed to pay the amounts due and be in good standing in order to obtain the software.  Therefore, while the Nielsen Partnership's failure to make its payment prior to 120 days of withdrawal could not be the sole basis for finding that the partnership was not in good standing, the Nielsen Partnership's payment of the money within 120 days of withdrawal could likewise not guarantee receipt of the software code.

      The business judgment rule applies in the context of business questions, including contract-based questions, and operates to insulate the HTA Defendants from liability with respect to the HTA Defendants's determination that the Nielsen Partnership was not in good standing when it withdrew from HTA.  The United States Supreme Court has held that "business

questions" are "ordinarily a matter of internal management and left to the discretion of the directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532 (1984).  The business judgment rule exists because courts realize "that in order to make [a] corporation function effectively, those having management responsibility must have the freedom to make in good faith the many necessary decisions quickly and finally without the impairment of having to be liable for an honest error in judgment." *Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514, 518 (10th Cir. 1973).   Moreover, "it is not the right or privilege of a court to set up its judgment as to whether or not the directors of a corporation have acted wisely in its management." *Chapman v. Troy Laundry Co.*, 47 P.2d 1054, 1064 (Utah 1935).

Here, the Nielsen Defendants claim the HTA Defendants breached the Operating Agreement in determining that the Nielsen Partnership was not in good standing at the time it sought to withdraw from HTA.  The Operating Agreement clearly conditions the withdrawing member's right to the software upon withdrawal on whether the member has been in good standing for the preceding six months.  The Agreement does not define good standing.  Therefore, the company has to use its business judgment to determine whether the member has been in good standing.

According to the meeting minutes of the members's meeting to determine good standing, there were many reasons the members articulated for finding that the Nielsen Partnership was not in good standing.  There is no evidence of bad faith on the part of the HTA Defendants in making the good standing determination.  It is undisputed that Nielsen did not inform HTA that he was dealing directly with Mitochon, Nielsen failed to communicate the terms of several Mitochon proposals to the HTA members, Nielsen acknowledged to the other HTA members that the sale

of the software to Mitochon would be harmful to HTA and its affiliates, Nielsen acknowledged that the other members's concerns about selling the software to Mitochon were valid concerns, and Nielsen reached an understanding to sell the source code to Mitochon without telling any other HTA member that he had done so.

The Nielsen Defendants argue that the HTA Defendants's justifications for finding that the Nielsen Partnership was not in good standing are based on disputed facts. However, regardless of whether the Nielsen Partnership withdrew from HTA in October or December, it had already reached an understanding with Mitochon when it withdrew without providing any of the information regarding such negotiations to the other members of HTA. Nielsen does not dispute that he agreed not to deal directly with Mitochon and then failed to disclose his dealings with Mitochon to the other HTA members.

The Nielsen Defendants ask the court to view Nielsen's actions in light of the fact that the Operating Agreement allowed competition. While the Operating Agreement is a unique business agreement, there are still fiduciary duties among the members and a duty to account to HTA. Whether or not the HTA Defendants's business judgment was correct in determining that the Nielsen Partnership was not in good standing, the court finds no basis for overturning the members's business judgment. The HTA Defendants acted within the scope of their corporate authority in making the determination, there were facts to support their decision, there is no evidence of bad faith, and the determination is protected by the business judgment rule. The court, therefore, concludes that HTA was not contractually obligated to deliver the software to the Nielsen Partnership because of the HTA members's decision that the Nielsen Partnership was not in good standing. Accordingly, the HTA Defendants could not have breached the Operating

Agreement as a matter of law and are entitled to summary judgment on the Nielsen Defendants's claims based on the good standing determination.

## 2. Intentional Interference Claims

To prove intentional interference with economic relations, a claimant must prove that the intentional interference resulted in damages and was "for an improper purpose" or "by improper means." *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). The tort claim of intentional interference with contract relations is designed to protect existing contractual relationships.

As discussed above, the Nielsen Partnership did not have a viable economic relationship with Mitochon and could not have reasonably expected to derive economic benefit from it. At the time the Nielsen Partnership entered into an understanding with Mitochon, it was still a member of HTA and HTA was the sole owner of the software. Even if Nielsen believed that he had given a notice of withdrawal at the time that he entered the formal agreement with Mitochon, the determination as to good standing had not been made. A withdrawing member of HTA is not automatically entitled to the software upon withdrawal. The Nielsen Partnership did not have an absolute right to the software it purported to sell to Mitochon. Therefore, HTA did not interfere with any of the Nielsen Defendants's economic rights.

Even if the HTA Defendants's actions could constitute interference, the HTA Defendants had no knowledge of Mitochon and the Nielsen Defendants' putative economic relations because Nielsen intentionally withheld such information. The Nielsen Defendants did not provide HTA with the specifics of their deal with Mitochon until after HTA had made its determination that the Nielsen Partnership was not in good standing.

Under Utah law, to establish improper means, "a plaintiff must show that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Leigh*, 657 P.2d at 308. The defendant's actions must be illegal or tortious in themselves." *Id.* The *Leigh Furniture* court recognized that in most circumstances an intentional breach of contract does not constitute "improper means." 657 P.2d at 308. A deliberate breach of contract, "even when employed to secure economic advantage," does not rise to the level of improper means. *Id.* at 309. "Neither a deliberate breach of contract nor an immediate purpose to inflict injury which does not predominate over a legitimate economic end will, by itself, satisfy [the improper means] element of the tort. However, they may in combination." *Id.*

The Nielsen Defendants ignore the "predominant purpose" requirement in the improper means breach of contract context. The Nielsen Defendants cannot turn a contract action into a tort action. "Because the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort." *Id.* at 309, 311.

The evidence in this case establishes that the HTA Defendants had numerous concerns about the sale of the software to a third party. Nielsen understood these concerns and sold the software without telling any of the other HTA members. Whether or not the HTA members were correct in their decisions about whether the Nielsen Partnership was in good standing, their actions were within their corporate authority. Nielsen admitted that the members' principals acted within their corporate authority and took actions that were in the best interests of HTA. Therefore, the Nielsen Defendants cannot demonstrate that the HTA Defendants acted with

improper means. Accordingly, the HTA Defendants are entitled to summary judgment on the Nielsen Defendants's tortious interference claims.

## CONCLUSION

Based on the above reasoning, the HTA Defendants' Motion for Summary Judgment Regarding Nielsen Partnership's Good Standing is GRANTED; the HTA Defendants' Motion for Summary Judgment Re: Nielsen Parties' Tortious Interference Claims is GRANTED; and the HTA Defendants' Motion for Summary Judgment Regarding Nielsen Parties's Claims Against Individual Defendants Putnam, Service, and Jenkins is GRANTED. Because this decision disposes of all the remaining claims in the case, the Clerk of Court is directed to close the case.

DATED this 23rd day of March, 2015.

BY THE COURT:

DALE A. KIMBALL
United States District Judge